# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 7366 | **DATE** | 3/24/2004 |
| **CASE TITLE** | Shyman vs. Unum Life Insurance Co. of America | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing is set for 5/26/04 at 9:30AM.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Order. For the reasons given in the attached memorandum opinion and order, defendant's motion to strike [36-1], defendant's motion for summary judgment [25-1], and plaintiff's motion for summary judgment [27-1] are granted in part and denied in part. The defendant is directed to give further consideration to plaintiff's claim that he was entitled to disability benefits in October, November, and December 1999. Within 40 days after the entry of this Order, defendant shall inform plaintiff in writing regarding any further submissions that will be required from plaintiff.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | Document Number |
| | No notices required. | | number of notices | | |
| | Notices mailed by judge's staff. | | MAR 2 5 2004 | | |
| | Notified counsel by telephone. | | date docketed | | 43 |
| X | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| RJ/KB | courtroom deputy's initials | | date mailed notice | | |
| | | Date/time received in central Clerk's Office | | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IRA SHYMAN, | ) | **DOCKETED** |
| | ) | |
| Plaintiff, | ) | MAR 2 5 2004 |
| | ) | |
| v. | ) | Case No. 01 C 7366 |
| | ) | |
| UNUM LIFE INSURANCE COMPANY | ) | Honorable Joan B. Gottschall |
| OF AMERICA, | ) | |
| | ) | Magistrate Judge Ashman |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Ira Shyman, a floor trader with the Chicago Board of Trade, brought this diversity action against defendant UNUM Life Insurance Company of America ("UNUM"), the underwriter of his group disability insurance policy, alleging breach of contract and unreasonable denial of insurance benefits under Illinois law. UNUM contends that Shyman's policy is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, so his claims in this case must be resolved according to the terms and provisions of ERISA. Before the court are the parties' cross-motions for summary judgment and UNUM's motion to strike portions of Shyman's Local Rule 56.1 statement of facts. For the reasons that follow, UNUM's motion to strike is denied and the cross-motions for summary judgment are granted in part and denied in part.

### I. BACKGROUND

Ira Shyman was an independent floor trader at the Chicago Board of Trade who cleared his trades through Shatkin, Arbor, Karlov & Co. ("Shatkin"). UNUM underwrites a

group disability policy (the "Policy") that is available to employees of Shatkin, as well as independent traders, such as plaintiff, who are affiliated with Shatkin. In 1999, based on a chronic problem with headaches, plaintiff applied for long-term disability benefits under the Policy and was found to be disabled as of November 21, 1998. UNUM paid plaintiff benefits through May 31, 1999. Plaintiff contends that, as of October 1999, he again qualified for long-term disability benefits. His subsequent requests for benefits, however, have been denied.

Plaintiff relied on diversity jurisdiction in bringing the present action. The complaint does not contain adequate allegations as to diversity. It is alleged that plaintiff is a citizen of Illinois and that defendant is a citizen of Maine. However, there are no express allegations regarding defendant's place of incorporation or principal place of business. Nevertheless, defendant does not dispute that it is a Maine citizen for purposes of diversity or that there is complete diversity of citizenship. Reported cases support both that defendant is a Maine corporation and that its principal place of business is located in Maine. *See Owens v. UNUM Life Ins. Co. of America*, 285 F. Supp. 2d 778, 779 (E.D. Tex. 2003); *McCall v. UNUM Life Ins. Co. of America*, No. 3:01-CV-1151-M, 2001 WL 1388013, at *4 (N.D. Tex. Nov. 6, 2001); *Schneider v. UNUM Life Ins. Co. of America*, 149 F. Supp. 2d 169, 175 (E.D. Pa. 2001); *Ehrhart v. UNUM Life Ins. Co. of America*, No. 99 C 1340, 1999 WL 498597, at *1 (N.D. Ill. July 2, 1999). There is complete diversity of jurisdiction and the amount in controversy exceeds $75,000. To the extent the claims are properly denominated as being state law claims, there is adequate jurisdiction.

In his complaint, plaintiff indicates that his claims are brought pursuant to Illinois law. Count I is a claim for breach of contract. Count II is a claim that insurance benefits have been

2

vexatiously and unreasonably denied in violation of the Illinois Insurance Code, 215 ILCS 5/155. Defendant contends that the Policy is a benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* Defendant contends that Count I should be treated as a claim for the denial of benefits governed by 29 U.S.C. § 1132(a)(1)(B). Defendant contends the Count II claim for violation of the Illinois Insurance Code is preempted by ERISA. Presently pending are cross-motions for summary judgment. Defendant has also moved to strike portions of plaintiff's Local Rule 56.1 statement filed in support of his summary judgment motion.

On a motion for summary judgment, the entire record is considered with all reasonable inferences drawn in favor of the nonmovant and all factual disputes resolved in favor of the nonmovant. *Turner v. J.V.D.B. & Associates, Inc.,* 330 F.3d 991, 994-95 (7th Cir. 2003); *Palmer v. Marion Count,* 327 F.3d 588, 592 (7th Cir. 2003); *Abrams v. Walker,* 307 F.3d 650, 653-54 (7th Cir. 2002). The burden of establishing a lack of any genuine issue of material fact rests on the movant. *Outlaw v. Newkirk,* 259 F.3d 833, 837 (7th Cir. 2001); *Wollin v. Gondert,* 192 F.3d 616, 621-22 (7th Cir. 1999). The nonmovant, however, must make a showing sufficient to establish any essential element for which he or it will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Binz v. Brandt Constr. Co.,* 301 F.3d 529, 532 (7th Cir. 2002); *Traylor v. Brown,* 295 F.3d 783, 790 (7th Cir. 2002). The movant need not provide affidavits or deposition testimony showing the nonexistence of such essential elements. *Celotex,* 477 U.S. at 324. Also, it is not sufficient to show evidence of purportedly disputed facts if those facts are not plausible in light of the entire record. *See NLFC, Inc. v. Devcom Mid-America, Inc.,* 45 F.3d 231, 236 (7th Cir. 1995); *Covalt v. Carey Canada, Inc.,* 950 F.2d 481, 485 (7th Cir. 1991); *Collins v. Associated Pathologists, Ltd.,* 844 F.2d 473, 476-77 (7th Cir. 1988).

3

Defendant contends that plaintiff's claims fall under ERISA and are subject to arbitrary and capricious review. Under arbitrary and capricious review, review of a plan's decision is generally limited to evidence or information that was before the reviewing body. *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 462 (7th Cir. 2001); *Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan*, 195 F.3d 975, 982 (7th Cir. 1999); *Sisto v. Ameritech Sickness & Accident Disability Benefit Plan*, No. 01 C 8262, 2003 WL 22472022, at *2 (N.D. Ill. Oct. 31, 2003); *Bahnaman v. Lucent Tech., Inc.*, 219 F. Supp. 2d 921, 925 (N.D. Ill. 2002). Although the parties' motions are summary judgment motions, the motions actually seek administrative review of the decision to deny benefits, with the composition of the administrative record being the essential uncontested fact. Evidence outside the administrative record is appropriate to consider only to the extent it goes to procedural issues, such as whether the Policy is an ERISA benefit plan or whether arbitrary and capricious review applies. *Cf. Perlman*, 195 F.3d at 982; *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 619 (6th Cir. 1998); *Sisto*, 2003 WL 22472002, at *2; *Eriksen v. Metropolitan Life Ins. Co.*, 39 F. Supp. 2d 864, 866 n.2 (E.D. Mich. 1999). On the other hand, if plaintiff is correct in contending either (a) that his claims are not governed by ERISA or (b) that even if governed by ERISA, his claims are not subject to arbitrary and capricious review, there would be straightforward application of the summary judgment standard to all aspects of plaintiff's claims and the court would not be limited to considering only the evidence that was presented in administrative proceedings. *See Casey v. Uddeholm Corp.*, 32 F.3d 1094, 1098-99 n.4 (7th Cir. 1994); *Robyns v. Reliance Standard Life Ins. Co.*, No. IP 98-1241-CH/K, 2003 WL 21850820, at *5 (S.D. Ind. July 10, 2003); *Bowman v. Reliance Standard Life Ins. Co.*, No. 02 C 6188, 2003 WL 1524476, at *5 (N.D. Ill. Mar. 21, 2003).

Before addressing the merits, defendant's motion to strike will be briefly addressed. Defendant contends that certain paragraphs of plaintiff's Local Rule 56.1(a)(3) statement[1] should be stricken because they are (a) too lengthy, (b) unsupported by the cited references, (c) argumentative, and/or (d) the facts contained therein are not material. Defendant contends that the Seventh Circuit has repeatedly held that strict compliance with Local Rule 56.1 is required. That is not exactly true. What the Seventh Circuit has held is that it is within the district court's discretion as to how strictly to enforce a local rule such as Local Rule 56.1. *See Metropolitan Life Ins. Co. v. Johnson*, 297 F.3d 558, 562 (7th Cir. 2002); *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000); *United States, Dept. of Navy v. Norden Enter., LLC*, No. 01 C 8968, 2004 WL 42318, at *3 (N.D. Ill. Jan. 6, 2004); *Menasha Corp. v. News America Mktg. In-Store, Inc.*, 238 F. Supp. 2d 1024, 1029 (N.D. Ill. 2003), *aff'd*, 354 F.3d 661 (7th Cir. 2004); *Alek v. Univ. of Chicago Hosp.*, No. 99 C 7421, 2002 WL 1332000, at *2 (N.D. Ill. June 17, 2002); *Traum v. Equitable Life Assurance Soc'y of United States*, 240 F. Supp. 2d 776, 780 (N.D. Ill. 2002); *Ogborn v. United Food & Commercial Workers, Local No. 881*, No. 98 C 4623, 2000 WL 1409855, at *2-3 (N.D. Ill. Sept. 25, 2000); *Gabriel v. City of Chicago*, 9 F. Supp. 2d 974, 975 n.2 (N.D. Ill. 1998). Here, no paragraph is found to be so lengthy, disjointed, or argumentative that defendant cannot respond. No paragraph will be stricken. To the extent any factual assertion contained in any of the Local Rule 56.1 statements is unsupported, the factual assertion will not be credited. To the extent any factual assertion is not material, it will not affect the outcome of today's ruling.

## II. APPLICABILITY OF ERISA

### A. Existence of Plan

The first issue to consider is whether, on uncontested facts, it can be conclusively determined that the Policy is or is not an ERISA plan. Plaintiff contends the Policy is not an

---

[1]Plaintiff's Local Rule 56.1(b)(3) response to defendant's summary judgment motion also incorporates paragraphs from plaintiff's Local Rule 56.1(a)(3) statement.

ERISA plan because it is not established and maintained as such and/or otherwise falls within the safe harbor set forth in 29 C.F.R. § 2510.3-1(j). Even if the Policy is an ERISA plan as regards Shatkin employees, plaintiff contends that his claim falls outside ERISA because he is an independent contractor permitted to participate in the Policy, not an employee of Shatkin.

An "employee welfare benefit plan," as defined by 29 U.S.C. § 1002(1), contains five elements: "(1) a plan, fund or program, (2) established or maintained, (3) by an employer or by an employee organization, or by both, (4) for the purpose of providing medical, surgical, hospital care, sickness, accident, disability, death, unemployment or vacation benefits, apprenticeship or other training programs, day care centers, scholarship funds, prepaid legal services or severance benefits, (5) to participants or their beneficiaries." *Ed Miniat, Inc. v. Globe Life Ins. Group, Inc.*, 805 F.2d 732, 738 (7th Cir. 1986). *Accord Postma v. Paul Revere Life Ins. Co.*, 223 F.3d 533, 537 (7th Cir. 2000); *Dwyer v. UNUM Life Ins. Co. of America*, No. 03 C 1118, 2003 WL 22844234, at *2 (N.D. Ill. Dec. 1, 2003).

Labor Department regulations provide a "safe harbor" excluding certain group-type insurance programs from the definition of employee welfare benefit plan. If all the following criteria are satisfied, the program falls outside the definition of employee welfare benefit plan.

> (1) No contributions are made by an employer or employee organization;
> (2) Participation in the program is completely voluntary for employees or members;
> (3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and
> (4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

29 C.F.R. § 2510.3-1(j).

The parties agree that defendant is an employer and that the Policy is available to employees of defendant, as well as to certain non-employees affiliated with defendant. The parties also agree that plaintiff is an independent contractor affiliated with defendant, not an employee. Thus, four of the five elements of the definition of an employee welfare benefit plan are satisfied. Plaintiff, however, contends that the "established or maintained" element is not satisfied. And as to the safe harbor elements, defendant contends that the third element is not satisfied because the Policy is endorsed by Shatkin.

Plaintiff argues that there are three separate bases for finding the Policy not to be an employee welfare benefit plan: (a) the Policy was not established by defendant; (b) the Policy is not maintained by defendant; and (c) the safe harbor. The "established or maintained" requirement is to be considered together with the safe harbor requirement. *See Postma*, 223 F.3d at 537; *Turnoy v. Liberty Life Assurance Co. of Boston*, No. 02 C 6066, 2003 WL 223309, at *3 (N.D. Ill. Jan. 30, 2003). The safe harbor essentially sets forth a minimal level of employer involvement that is below the minimum threshold necessary to constitute "established or maintained." *See Brundage-Peterson v. Compcare Health Servs. Ins. Corp.*, 877 F.2d 509, 511 (7th Cir. 1989). Moreover, plaintiff misreads the plain language of the statutory definition which requires only that the plan be "established <u>or</u> maintained" by the employer, not that it be both established <u>and</u> maintained. *Russo v. B & B Catering, Inc.*, 209 F. Supp. 2d 857, 861 (N.D. Ill. 2002). This element can be satisfied by the employer establishing the plan even if the employer delegates the administration (maintenance) of the plan to others. *Brundage-Peterson*, 877 F.2d at 511.

The Seventh Circuit has held that the definition of employee welfare benefit plan is to be construed broadly. *Id.; Dwyer*, 2003 WL 22844234, at *2; *Turnoy*, 2003 WL 223309, at *3; *Russo*, 209 F. Supp. 2d at 860; *Goodson v. American United Life Ins. Co.*, No. IP:02-0197-C-T/K, 2002 WL 1354715, at *3 (S.D. Ind. May 2, 2002). Only a minimal level of employer involvement is necessary to satisfy the "established or maintained" requirement. *Russo*, 209 F.

Supp. 2d at 860; *Ruttenberg v. United States Life,* No.01 C 8200, 2003 WL 21003719, at *2 (N.D. Ill. May 1, 2003)("*Ruttenberg I*"), *reconsideration denied,* 2004 WL 421989, at *7 (N.D. Ill. Feb. 19, 2004)("*Ruttenberg II*"); *Turnoy,* 2003 WL 223309, at *3. It is enough that an employer contracts with an insurance company to provide a group policy and designates which employees are eligible for enrollment. *Brundage-Peterson,* 877 F.2d at 511. *See also Turnoy,* 2003 WL 223309, at *3 ("If an employer favors one or more plans over allowing covered persons to shop in the open market, or if an employer defines eligibility or performs other administrative functions, ERISA may be implicated."); *Russo,* 209 F. Supp. 2d at 860 ("If the arrangement favors a finite set of plans over employees shopping in the open market, the favored plans are considered to have been established by the employer."). In order to fall within the safe harbor, it is essential that the employer maintain neutrality. *Thompson v. American Home Assurance Co.,* 95 F.3d 429, 436-37 (6th Cir. 1996); *Johnson v. Watts Regulator Co.,* 63 F.3d 1129, 1133-34 (1st Cir. 1995); *Ruttenberg I,* 2003 WL 21003719, at *2; *Turnoy,* 2003 WL 223309, at *3; *Russo,* 209 F. Supp. 2d at 860.

It is undisputed that the Policy incorporates Shatkin in its name and that Shatkin made the decision that the Policy would apply to two specified classes: full-time permanent employees and active traders. Jeanne Aleksiewicz was a Shatkin vice president who was in charge of obtaining insurance plans for employees and affiliates. She was also designated as Shatkin's contact regarding the Policy. Aleksiewicz used insurance broker Jeffrey Roche to seek a new group disability insurance carrier after a prior carrier decided to discontinue its program for Shatkin. Terms were negotiated with defendant and it was decided that the Policy would be an appropriate benefit to offer to Shatkin's employees and affiliated traders.

Under the terms of the Policy, Shatkin is designated as the Plan Administrator and as the agent for legal process. The Policy also contains provisions referring to the applicability of ERISA and rights under ERISA. The Policy provides that forms and plan documents can be obtained from the Plan Administrator and there is some evidence that forms were

requested through Shatkin. Defendant also presents evidence of a draft memorandum it was planning to send out in which it expressly endorsed the Policy and recommended it to its employees and affiliated traders. However, no evidence is presented that Shatkin actually distributed the memorandum to any employee or trader.[2] Defendant provides uncontested evidence that, when plaintiff applied for benefits, Aleksiewicz completed the employer's statement and job analysis, provided information regarding plaintiff's past earnings, and provided assistance in calculating whether his earnings satisfied the 80% test. However, it is not conclusively established that Shatkin provided any more information than it would have provided if contacted by an entirely independent insurance company with which an employee or trader had a disability policy. Further, nobody at Shatkin actually makes the decision of whether or not plaintiff or other claimants qualified for benefits. Though the Policy denominates Shatkin as the Plan Administrator, decisions as to awarding benefits are entirely in the hands of defendant, not Shatkin.

Affiliated traders paid all the premiums under the Policy. For employees, Shatkin paid all or part of the premiums. The employee or trader portion was collected by Shatkin and forwarded to defendant. Claims were initially filed with Shatkin and forwarded to defendant. Shatkin did not receive any fee for collecting and forwarding premiums and claim forms.

While Shatkin's involvement with the administration of the Policy was minimal, it was involved in establishing the Policy and did not satisfy the essential requirement of neutrality. Shatkin sought out the insurance provider and selected one it believed to be

---

[2]Plaintiff points to evidence that Aleksiewicz informed Roche that she did not intend to actively promote the Policy. Since Aleksiewicz is not an employee or agent of defendant, that evidence is not admissible as a party admission. See Fed. R. Evid. 801(d)(2). This evidence is hearsay to the extent that it is intended to directly show that Aleksiewicz did not promote the Policy. To the extent relevant, however, it is admissible to show Aleksiewicz's intent or state of mind. See EEOC v. University of Chicago Hosp., 276 F.3d 326, 333 (7th Cir. 2002); Aetna Life Ins. Co. v. Wise, 184 F.3d 660, 665-66 (7th Cir. 1999); Fenje v. Feld, __ F. Supp. __, No. 01 C 9684, 2003 WL 22922162, at *25 (N.D. Ill. Dec. 9, 2003).

appropriate for its employees and affiliated traders. Shatkin also decided who would be eligible for the Policy, limiting eligibility to full-time employees and affiliated traders. Moreover, this was the only disability policy offered to employees and traders through Shatkin. That is more than enough to constitute establishment of a plan that brings the Policy outside the safe harbor. *Brundage-Peterson*, 877 F.2d at 511; *Dwyer*, 2003 WL 22844234, at *2.[3] The facts that the Policy uses Shatkin's name in its title, lists Shatkin as the Policyholder, allows Shatkin (as Policyholder) to cancel the Policy, and allows Shatkin to amend the Policy, also support that Shatkin did not maintain neutrality. *See Sanfilippo v. Provident Life & Casualty Ins. Co.*, 178 F. Supp. 2d 450, 457 (S.D.N.Y. 2002). Additionally, although Shatkin does not pay any portion of the premium for affiliated traders, its payment of a portion of the premium for employees is evidence of endorsement of the Policy. *Ruttenberg I*, 2003 WL 21003719, at *3. The uncontested facts, viewed in the light most favorable to plaintiff, support only one conclusion: that the Policy is an employee welfare benefit plan covered by ERISA.

## B. Participant or Beneficiary

Even taking as true that the Policy is an ERISA plan, plaintiff contends that his claims do not fall under ERISA because he is not an employee and therefore not a participant or beneficiary. *See* 29 U.S.C. § 1132. It is clear that plaintiff is not a participant since, by definition, a participant must be an employee (or member of an employee organization), *see* 29 U.S.C. § 1002(7); *Hollis v. Provident Life & Accident Ins. Co.*, 259 F.3d 410, 415 (5th Cir. 2001); *Peterson v. Equitable Life Assurance Soc'y of United States*, 57 F. Supp. 2d 692, 705 (W.D. Wis. 1999); *Ritter v. Mass. Casualty Ins. Co.*, 439 Mass. 214, 786 N.E.2d 817, 821 (2003), and the parties agree plaintiff is not an employee of Shatkin. Therefore, plaintiff's claims fall under 29 U.S.C. § 1132 only if he is a beneficiary as that term is used in ERISA.

---

[3]*Dwyer* also concerns a Shatkin-affiliated trader and whether his claim under the same Policy falls under ERISA.

A beneficiary is defined as "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." 29 U.S.C. § 1002(8). Here, plaintiff was a person who, under the terms of the Policy, could be entitled to benefits under the Policy. Therefore, under the plain language of the statute, plaintiff is a beneficiary. Federal courts considering the application of this language to an independent contractor such as plaintiff have generally applied the plain language of the statute in holding that such a person is a beneficiary whose claims for benefits are governed by ERISA. *See Hollis*, 259 F.3d at 415; *Ruttenberg I* , 2003 WL 21003719, at *4-5; *Ruttenberg II*, 2004 WL 421989, at *7; *Turnoy*, 2003 WL 223309, at *5; *Peterson v. Equitable*, 57 F. Supp. 2d at 705.[4] *See also Wolk v. UNUM Life Ins. Co. of America*, 186 F.3d 352, 355-56 (3d Cir. 1999) (partner); *Peterson v. American Life & Health Ins. Co.*, 48 F.3d 404, 408 (9th Cir.) (same). Plaintiff argues that the Massachusetts Supreme Judicial Court's decision in *Ritter*, 786 N.E.2d at 823-24, should instead be followed.

In *Ritter*, the court acknowledged that the plain language of § 1002(8) indicates that anybody entitled to benefits falls within the definition of beneficiary and that ordinarily plain and unambiguous statutory language should be followed. *Id.*, 786 N.E.2d at 823. The court, however, also applied the statutory construction rule that, if possible, effect must be given to every clause and word of a statute. *Id.* (citing *Williams v. Taylor*, 529 U.S. 362, 364 (2000)). The court concluded that following the plain language would make the inclusion of "participant" in 29 U.S.C. § 1132(a)(1)(B) superfluous because all participants are entitled to benefits and therefore would also be beneficiaries under the plain language construction of § 1002(8). Under this reasoning, the inclusion of both "participant" and "beneficiary" in § 1132(a)(1)(B) was redundant; use of the term "beneficiary" would have been sufficient to

---

[4]*Dwyer*, 2003 WL 22844234 at *3, used different reasoning in determining that Dwyer, an affiliated trader covered by the same Policy as Shyman, was a participant and beneficiary under ERISA.

cover both participants and beneficiaries. *Ritter*, 786 N.E.2d at 823. The court also pointed to other provisions of ERISA that used the language "participants [and/or] their beneficiaries" as further indication that "beneficiary" was intended to refer only to a beneficiary of a participant, not to a person otherwise entitled to benefits. *Id.* at 834 (citing 29 U.S.C. §§ 1001(b), 1002(1)).

The reasoning in *Ritter* is based on a faulty premise; it is not true that all participants are also beneficiaries. *Ritter* quoted and considered only a portion of § 1002(8)'s definition of "participant." 786 N.E.2d at 823. The definition of participant is not limited to an employee or member "who is or may become eligible to receive a benefit of any type from an employee benefit plan." 29 U.S.C. § 1002(8). "Participant" is also defined as including an employee or member "whose beneficiaries may be eligible to receive any such benefit." 29 U.S.C. § 1002(8). The statute clearly envisions beneficiaries who are not also participants. Similarly, a participant may not be a beneficiary: a participant in a life insurance plan that only pays death benefits will not be a beneficiary of that plan; and a participant in a medical or other benefit plan who elects to only purchase coverage for a spouse, child, or other third party will not be a beneficiary of that plan. Thus, the plain language construction of "beneficiary" does not render superfluous the use of "participant" in § 1132(a)(1)(B). In any event, federal law is clear that if the statutory language is unambiguous it must be applied as written. *Ritter's* construction of § 1002(8)'s definition of beneficiary will not be followed.[5]

Applying the plain language of § 1002(8) and following the federal precedents cited above, the court concludes that a claim by an independent contractor for benefits under an ERISA employee welfare benefit plan is a claim by a beneficiary pursuant to 29 U.S.C.

---

[5] Recently, a federal judge in this district expressly rejected this holding of Ritter. *See Ruttenberg II*, 2004 WL 429189, at *7. Additionally, in *Cheng v. UNUM Life Ins. Co. of America*, 291 F. Supp. 2d 717, 719 (N.D. Ill. 2003), the court declined to modify, in light of *Ritter*, its determination that a law firm partner's claim for benefits constituted a claim by a beneficiary under ERISA. *Cheng* does not set forth its reasons for declining to follow *Ritter*.

§ 1132(a)(1)(B). Plaintiff's purported state law claims are preempted by ERISA and must instead be construed as claims pursuant to § 1132(a)(1)(B).

## C. Arbitrary and Capricious Review

Plaintiff also disputes whether his claim is subject to arbitrary and capricious review. Review under the arbitrary and capricious standard is highly deferential, but the court's deference need not be abject. *Hackett v. Xerox Corp. Long-Term Disability Plan*, 315 F.3d 771 (7th Cir. 2003). To be upheld, an administrator's decision must be supported by sufficient evidence in the record, have considered all relevant submissions, and be based on a reasonable interpretation and application of pertinent plan provisions. *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001).

The arbitrary and capricious standard applies only to judicial review of ERISA benefit determinations if the policy clearly expresses that the plan administrator has discretion to grant or deny claims for benefits. *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 331 (7th Cir. 2000). If the plan does not explicitly declare the administrator's discretion, the reviewing court will evaluate the decision to grant or deny benefits *de novo*. *Firestone Tire & Rubber v. Bruch*, 489 U.S. 101, 103 (1989). The Policy in this case provides, "When making a benefit determination under the Policy, UNUM has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the Policy." While not conforming to the "safe harbor" language suggested in *Herzberger*, this statement suffices to inform beneficiaries like plaintiff that "a discretionary determination is envisaged" and makes defendant's benefits determinations subject to arbitrary and capricious, rather than *de novo*, review. 205 F.3d at 331.

This highly deferential standard of review applies in this case even though the possibility exists that UNUM, as the *de facto* plan administrator[6] and insurer, may have a

---

[6]The Policy expressly designates Shatkin as the Plan Administrator, but gives UNUM the kind of responsibilities that make UNUM a fiduciary under ERISA. 29 U.S.C. § 1002(21)

conflict of interest between its fiduciary duty to plaintiff and its financial duty to itself and its shareholders. *See, e.g., Perlman*, 195 F.3d at 981; *O'Reilly v. Hartford Life & Accident Ins. Co.*, 272 F.3d 955, 960 (7th Cir. 2001) (stating that the "presence of a conflict of interest does not change the standard of review"). *But see Nord v. Black & Decker Disability Plan*, 296 F.3d 823, 828-28 (9th Cir. 2002), *rev'd on other grounds*, 538 U.S. 822 (2003) (holding that an "insurer with a dual role as the administrator and funding source for the plan has an inherent conflict of interest" which entitles it to a less deferential standard of review). Still, the Seventh Circuit advises that it is proper for the court to consider UNUM's financial self-interest as one factor in deciding whether defendant's decisions were arbitrary and capricious. *O'Reilly*, 272 F.3d at 960.

### III. CLAIMS FOR DISABILITY BENEFITS

### A. Policy Terms

The Policy's definition of disability involves an initial two-prong test.[7] Disability requires a determination that:

> - you are **limited** from performing the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury**; and
> - you have a 20% or more loss in your **indexed monthly earnings** due to the same sickness or injury.
>
> After 24 months of payments, you are disabled when UNUM determines that due to the same sickness or injury, you are unable to perform the duties of any **gainful occupation** for which you are reasonably fitted by education, training or experience.

Benefits will not be paid until after a 90-day elimination period of being disabled.

For traders such as plaintiff, the Policy provides that monthly earnings are calculated by averaging the 24 calendar month period just prior to the date of disability, or a

---

(a "fiduciary" is someone who "has any discretionary authority or discretionary responsibility in the administration of" a Plan).

[7]The two prongs will be referred to as the "medical" and "earnings" prongs.

lesser period if the trader had not been affiliated with Shatkin for 24 months.[8] Regarding earnings during the disability period, the Policy provides:

> If your disability earnings routinely fluctuate widely from month to month, UNUM may average your disability earnings over the most recent 3 months to determine if your claim should continue.

> If UNUM averages your disability earnings, we will not terminate your claim unless:
> - During the first 24 months of disability payments, the average of your disability earnings from the last 3 months exceeds 80% of indexed monthly earnings; or
> - Beyond 24 months of disability payments, the average of your disability earnings from the last 3 months exceeds 60% of indexed monthly earnings.

> We will not pay you for any month during which disability earnings exceed the amount allowable under the plan.

Disability payments will end for the following reasons, among others.

> - during the first 24 months of payments, when you are able to work in your regular occupation on a **part-time basis** but you choose not to;
> * * *
> - the end of the maximum period of payment;
> - the date you are no longer disabled under the terms of the plan;
> - the date you fail to submit proof of continuing disability;
> - the date your disability earnings exceed the amount allowable under the plan; . . . .

There is a provision that:

> Disabilities, due to sickness or injury, which are primarily based on **self-reported symptoms** . . . have a limited pay period up to 24 months.
> * * *
> **SELF-REPORTED SYMPTOMS** means the manifestations of your condition which you tell your doctor, that are not verifiable using tests, procedures or clinical examinations standardly accepted in the practice of medicine. Examples of self-reported symptoms include, but are not limited to headaches, pain, fatigue, stiffness, soreness, ringing in ears, dizziness, numbness and loss of energy.

---

[8]"Indexed monthly earnings" also includes an adjustment for inflation on the yearly anniversaries of the beginning of payments. Resolution of plaintiff's claims does not require consideration of this adjustment.

Regarding recurring claims, the Policy provides:

> If you have a **recurrent disability**, UNUM will treat your disability as part of your prior claim and you will not have to complete another elimination period if:
>
> - you were continuously insured under the plan for the period between your prior claim and your recurrent disability; and
> - your recurrent disability occurs within 6 months of the end of your prior claim
>
> Your recurrent disability will be subject to the same terms of this plan as your prior claim.
>
> Any disability which occurs after 6 months from the date your prior claim ended will be treated as a new claim. The new claim will be subject to all of the policy provisions.
>
> * * *
>
> **RECURRENT DISABILITY** means a disability which is:
> - caused by a worsening in your condition; and
> - due to the same cause(s) as your prior disability for which UNUM made a Long Term Disability payment.

## B. Administrative Proceedings

On April 6, 1999, plaintiff submitted his first claim for disability benefits. He claimed he had been disabled since November 21, 1998, due to chronic migraine headaches and neck pain. In a letter dated July 8, 1999, defendant informed plaintiff that his claim had been approved and that it was determined that his date of disability was November 21, 1998. Because of the 90-day elimination period, payments were effective February 19, 1999. Plaintiff was paid for the remainder of February and for April and May, 1999. Plaintiff was not paid for March 1999 on the ground that he had worked part-time in March and he did not satisfy the earnings prong because his earnings for that month had exceeded the 80% limitation. The letter also stated that plaintiff's predisability earnings were calculated based on his 1997 and 1998 1099 forms and determined to be $95,525.00 per month. Plaintiff was further informed that his earnings would continue to be tracked and that he should arrange to have Aleksiewicz forward his monthly commodity statements as promptly as possible to expedite determinations that he qualified each month. It was also noted that medical documentation of a

continuing disability might be requested.

In a letter dated September 1, 1999, defendant informed plaintiff that, although he had received a disability payment for June 1999, it had subsequently been determined that he exceeded the 80% earning limitation for that month. While information was being gathered as to July and August 1999 earnings, however, no refund would yet be demanded for the June 1999 payment.

In a letter dated September 22, 1999, defendant informed plaintiff that his disability benefits were being terminated because he had exceeded the 80% earnings limitation for three consecutive months. It is stated that he earned $304,587.46, $252,684.82, and $378,772.48 for June, July, and August 1999, which exceeded his $95,525.00 per month predisability earnings. It was also stated that it had been determined that he had not exceeded the earnings limitation for March 1999 and therefore should have received a disability payment for that month. Therefore, no refund would be required for the June 1999 disability payment. It is also stated: "In the event that you continue to be limited in your work capacity, and you start having a 20% loss in your monthly earnings from your regular occupation as a commodity trader, you should contact us immediately to initiate the re-opening of your claim."

Plaintiff thereafter telephonically protested the calculations of his earnings and defendant reconsidered its determination. In letters dated January 3 and 4, 2000,[9] defendant again terminated benefits effective May 31, 1999. This time, however, defendant considered earnings through November 1999 and, for the first time, employed an averaging method for plaintiff's disability earnings based on the fact that plaintiff's earnings fluctuated. However, instead of using the three-month averaging method that is a term of the Policy, defendant used a six-month rolling average. Under that method, the earnings number for a particular month

---

[9]The first letter mistakenly omitted some pages of an attachment and the second letter contained the addition of responding to questions plaintiff raised in a telephone conversation after receiving the January 3 letter via fax.

that is compared to predisability earnings was the average of the earnings for that month and the five previous months. Based on a new calculation of earnings, plaintiff's actual earnings for June 1999 were the same as previously calculated and the actual earnings for July 1999 increased slightly to $253,472.32. However, actual earnings for August 1999 were determined to be only $18,247.48 and for September through November 1999 actual earnings were determined to be: $36,534.12, ($27,004.85), and 22,305.41 respectively. The rolling six-month average for each of those months, however, was greater than 80% of predisability earnings. The rolling six-month averages for February through May 1999 were all below the 80% limitation. If a three-month rolling average had been applied, the 80% limitation would not have been exceeded in October or November 1999, nor would it have been exceeded from February through May 1999.

Notes of telephone calls from plaintiff show that he had questioned the determination of actual income, that he reported he had not worked since August 1999, and that he questioned the use of the six-month averaging method. In the January 4, 2000, letter, defendant explained that a six-month rolling average was used because of the wide fluctuations in plaintiff's monthly income. No explanation is provided as to why the averaging was done over six months instead of three months.[10] As to plaintiff not working since August 1999, defendant stated that it was plaintiff's responsibility to have timely informed defendant of such a change and that no notification of that fact had been provided prior to plaintiff's January 4, 2000, telephone call. It is further stated:

> At this time, your claim cannot be re-opened until you provide us with sufficient medical documentation including test reports and timely office visit records from your physician supporting that your medical

---

[10]The only evidence regarding questions raised by plaintiff is the January 4 letter acknowledging that a question had been raised and notes of defendant's employee regarding a telephone conversation with plaintiff. It is unclear if plaintiff questioned the number of months used for averaging or if he only questioned using any averaging instead of the actual earnings for each month.

condition worsened as of August. Your physician must send us written certification for the basis for your total disability to support that your claim should be re-opened.

You should also submit any and all time record documentation supporting that you have been totally out of work since August 1999.

Mr. Shyman, we will review your 1999 1099s as soon as they are available as well as your December 1999 broker earnings statement. We will also review the additional medical information from your physician to support the worsening of your medical condition in August 1999.

However, we cannot re-open your claim until you provide us with the above-referenced documentation.

Plaintiff was also advised of his appeal rights.

Plaintiff appealed this decision.[11]  In a letter dated April 11, 2000, the January 4, 2000, decision was upheld on appeal. The six-month rolling average was again employed in determining that plaintiff had not satisfied the 80% limitation for June through November 1999. It is stated: "[B]ecause you did not sustain an earnings loss of greater than 20% over the 3 month period following May 31, 1999, your claim for benefits ended." Plaintiff was further advised that, should he claim he was disabled in December 1999 or thereafter, that would not be a recurrent claim and he would have to show both that he was disabled and that he met the active employment requirement for the applicable time period.

On June 19, 2000,[12] defendant received plaintiff's second claim for disability benefits. Plaintiff submitted an attending physician statement with this claim. Plaintiff claimed he had been unable to work beginning August 1, 1999, and that he had worked part-time beginning April 1, 2000. In a letter dated August 7, 2000, this claim was denied. Because the date of disability was within six months of the May 31, 1999, termination of benefits for the first

---

[11]Neither party cites to plaintiff's written appeal and it has not been found in the administrative record that has been provided.

[12]Although shown as received by defendant on June 19, 2000, the claim form is dated May 5, 2000. It apparently was submitted to Shatkin before being forwarded to defendant.

19

claim, the second claim was treated as a claim for recurrent disability to be evaluated as part of the first claim. The second claim was denied for the reasons stated in the April 11, 2000, ruling on the appeal of the first claim. Plaintiff was informed that he had exhausted administrative remedies on this claim.

On October 12, 2000, defendant received plaintiff's third claim for disability benefits. Additional medical documentation was submitted with this claim. The claim form did not contain a date for the onset of disability. Based on records of Shatkin, defendant determined that plaintiff's last date of working was December 31, 1999, and therefore considered whether plaintiff was disabled as of January 1, 2000. The administrative record also contains notes of a telephone conversation between plaintiff and one of defendant's benefits specialists which indicates that plaintiff stated he completely stopped working on December 31, 1999. It also indicates that plaintiff attempted to work off and on from April through June 2000 before stopping again.

In a letter dated January 17, 2001, defendant found that plaintiff was not disabled. It states that defendant had previously determined that the records of plaintiff's treating physician, Dr. Lawrence Robbins, did not contain objective medical evidence supporting an impairment and had decided to do surveillance of plaintiff on six days in late November and early December 2000. Defendant found that the observed activity included no observations indicating discomfort or pain. Based on a medical consultant's review of the file, it was found that the medical records and surveillance did not support that plaintiff had frequent and severe enough headaches to preclude continued work. The opinions of Dr. Robbins were found to be non-credible in that they were not supported by objective medical evidence and Dr. Robbins had expressed prior opinions of total disability at times plaintiff was working and not suffering an earnings loss.

Plaintiff thereafter retained counsel who filed a timely appeal and provided additional medical documentation in the form of an October 14, 1999, attending physician report from

Dr. Robbins. In addition to raising issues regarding the denial of the third claim, it was argued that there were errors in denying the first claim as well. In a letter dated June 8, 2001, the appeal was denied. In describing the termination of benefits as of May 31, 1999, it is stated that "[i]t was also determined that the three months earning average ($192,102.42) for June, July and August 1999 clearly exceeded 80% of his indexed monthly earnings of $95,595.25. Accordingly, UNUM stopped sending Mr. Shyman payments as of May 31, 1999, and his claim ended in accordance with the terms of his policy."[13] The appeal considered the third claim to be for a disability beginning January 1, 2000, which was more than six months after the May 31, 1999 termination of benefits and thus not a recurrent claim. The appeal left open the question of whether plaintiff had worked enough hours during the preceding months to satisfy the active employment requirement necessary for eligibility for benefits. The appeal upheld the grounds for finding plaintiff was not disabled as of January 1, 2000. In addition, it is expressly noted that the indications of plaintiff's limitations contained in Dr. Robbins's files appeared to be limited to "self reports" of plaintiff. It is also noted that plaintiff did not have an office visit with Dr. Robbins between October 21, 1999, and February 16, 2000. As to the October 14, 1999, report of Dr. Robbins, it is noted that this is one month and a half before the purported disability date and that it indicates plaintiff could not concentrate to do any meaningful work for the past 12 months. The latter was found to be inconsistent with plaintiff working and having substantial earnings during that time period.

On August 3, 2001, plaintiff's counsel sent defendant a copy of an August 2, 2001, letter from treating physician Robbins. Dr. Robbins's letter states that plaintiff had been in his office in February, May, and July 2001 and they had also had four telephone conversations. It states that plaintiff was on a daily long-acting narcotic opioid and other medication and that the medications control the headaches to a point, but the headaches are still severe and debilitating.

---

[13]That is a correct statement of the three-month rolling average for August 1999. The denial of the first claim, however, used a six-month average.

Dr. Robbins's curriculum vitae with a lengthy list of publications is also provided. In the attorney's cover letter, it is stated that he was prepared to initiate litigation but would first like to know if Dr. Robbins's letter would change the prior determination.

The attorney's letter was treated as an additional appeal which was denied in a letter dated August 8, 2001. The basis for the prior decision on appeal is summarized. As to the additional letter from Dr. Robbins, it is stated that the letter was referred to defendant's medical department which noted that the 2001 office visits are well outside the relevant time period for a purported January 1, 2000, disability date. The medical department noted that plaintiff's condition appears to be managed appropriately, but "this additional information does nothing to further UNUM's understanding of what changed in his medical condition on or about January 1, 2000, such that his work capacity decreased to the point where it became disabling."

Plaintiff raises two principal grounds of error. Plaintiff contends defendant improperly applied a six-month rolling average instead of using the three-month method referred to in the policy. Second, plaintiff contends that it was unreasonable to find the evidence was insufficient to support a finding of disability. The parties also dispute whether any of plaintiff's claims should have been treated as a recurrent claim and whether plaintiff's claim should be considered a self-reported sickness that is limited to 24 months of benefits.

## C. Plaintiff's First and Second Claims of Disability

Defendant does not dispute that it was inconsistent with explicit terms of the Policy to use six-month averaging for determining plaintiff's disability earnings. Ignoring the plain and unambiguous language of an ERISA plan and providing no sufficient explanation for the alternative reading is a sufficient basis for finding arbitrary and capricious conduct. *See Hess*, 274 F.3d at 461-62; *Cozzie v. Metropolitan Life Ins. Co.*, 140 F.3d 1104, 1108-09 (7th Cir. 1998); *Swaback v. American Info. Technologies Corp.*, 103 F.3d 535, 540 & n.9 (7th Cir. 1996). The June 8, 2001, decision on appeal apparently recognized it was improper to use six-month

averaging. In describing a prior decision, it recast the prior decision as applying a three-month average and calculating the three-month average for August 1999, which is not what the prior decision had actually done. However, although it was arbitrary and capricious to use six-month averaging, use of six-month averaging did not affect the decision to discontinue benefits as of May 31, 1999. There is no dispute that, even applying three-month averaging, plaintiff did not satisfy the 80% limitation for June through September 1999. The only effect the improper use of six-month averaging could have had was on considering a recurrent claim beginning in October or November 1999, that is, within six months after May 31, 1999, and during a month when plaintiff did not exceed the 80% earnings limitation.

A question exists as to whether defendant acted arbitrarily and capriciously by failing to consider whether plaintiff was disabled as of October 1, 1999, or some other date prior to December 1, 1999. The initial decision to terminate benefits was dated September 22, 2003. As of that time, plaintiff had not yet had another month in which he satisfied the 80% limitation. Therefore, no basis existed at that time for considering a recurrent disability. Instead, defendant advised plaintiff that he could seek to reopen his claim should he again meet the income limitation. In the initial ruling, defendant exercised its discretion to consider each month's actual income.[14]

Plaintiff disputed the calculation of his August 1999 earnings and defendant reconsidered its September 1999 decision, taking into account earnings through November 1999 and exercising its discretion to average the income plaintiff was earning during this period of disability. In the January 2000 decision, however, defendant improperly used six-month averaging instead of three-month averaging. It was an abuse of discretion to ignore the clear and plain language of the Policy. This resulted in an incorrect determination that plaintiff did

---

[14]The Policy provides that defendant "may" use averaging if the claimant has widely fluctuating income. Use of averaging is not mandatory. However, if defendant elects to use averaging, the Policy provides that three-month averaging is to be used, not the six-month averaging subsequently employed by defendant.

not meet the earnings prong of being disabled for October and November 1999. Had defendant appropriately applied the Policy's earnings prong, it may have found that plaintiff was entitled to benefits for October and November 1999 because he continued to satisfy the medical prong. At that point in the administrative process, no issue had yet been raised as to whether plaintiff continued to satisfy the physical requirements; the only issue being considered was plaintiff's satisfaction of the 80% limitation.

Defendant contends there was no abuse of discretion because plaintiff never submitted a claim in which he contended he was disabled effective October 1999. Plaintiff, however, always contended that he was physically disabled and even submitted a second claim with an August 1, 1999, disability date.[15] Although the Policy provides that the claimant has the burden of submitting medical documentation of disability with a proof of claim, the Policy also provides that there is no burden of submitting documentation of a continuing disability unless requested by defendant. "We may request that you send proof of continuing disability indicating that you are under the regular care of a doctor. This proof, provided at your expense, must be received within 30 days of a request by us." Had defendant properly recognized that plaintiff met the income limitations for October and November, 1999, it would have been an abuse of discretion for defendant to fail to consider whether plaintiff was entitled to benefits for those months based on a recurrent disability. As a matter of fact, defendant was considering whether plaintiff qualified for benefits in October and November 1999; it just never got beyond the earnings prong of the Policy's definition of disability. Although the January 4, 2000, decision indicated that plaintiff would have to submit medical documentation in order to "re-open" his claim based on a worsening of his medical condition in August 1999, the April 11, 2000, decision on appeal only addressed the earnings prong and made no decision about an August 1 onset date or the medical prong. Moreover, when

---

[15]The denial of the second claim incorporated the reasoning of the denial of the first claim. Therefore, the two claims may appropriately be considered together.

plaintiff submitted his second claim based on an August 1, 1999, disability date, the ruling on that claim simply incorporated the reasoning of the April 11, 2000, decision without giving any consideration to plaintiff's medical condition. Further, to the extent the January 17, 2001, ruling on the appeal of plaintiff's third claim was also considering the merits of plaintiff's first and/or second claim, the January 17, 2001, decision only considered whether it was proper to terminate benefits as of May 31, 1999, and not pay benefits through August 1999. The January 17, 2001 decision did not address whether plaintiff qualified for benefits in October and November 1999, its chief concern being whether a claim for a disability as of January 1, 2000, was outside the six-month recurrent disability period following the May 31, 1999, termination of benefits.

Defendant's improper use of six-month averaging was responsible for preempting any consideration of the medical prong for October and November 1999. Defendant's own error should not be twisted into a default by plaintiff in failing to sufficiently raise that he was disabled as of October and November 1999. Because plaintiff's qualifications for benefits for October and November 1999 were actually being considered by defendant and because defendant was considering a termination of benefits, it was unnecessary for plaintiff to separately submit a new claim with an explicit disability date in October or November 1999 in order to bring that time period before defendant.

Defendant also contends that plaintiff cannot be entitled to benefits for October and November 1999 because he has not shown that his condition worsened in October 1999, which is part of the definition of recurrent disability. As previously discussed, defendant was responsible for preempting consideration of plaintiff's medical condition during Fall 1999 and no determination was ever made as to plaintiff's medical condition during that time period. Although the medical prong was addressed when plaintiff's third disability claim was considered, including some medical evidence from 1999, the focus of that inquiry was on whether plaintiff satisfied the medical prong as of January 1, 2000. No determination was ever

made as to whether plaintiff satisfied the medical prong in October or November 1999.[16] Just as the medical prong was never considered by defendant regarding October and November 1999, the "worsening" prong of recurrent disability was never considered by defendant. Plaintiff cannot be faulted for failing to present documentation on that issue.

Also, the language of the Policy is not clear that plaintiff would have to satisfy the worsening prong. Although the plain language of the Policy includes such a prong in the definition of recurrent disability, this definition must be read within the context of the entire Policy and plaintiff's situation. The definition of recurrent disability contained in the Glossary of the Policy goes only to medical issues. Plaintiff's benefits were not terminated because of a change in his medical condition that resulted in his failure to satisfy the medical prong of disability. Plaintiff's benefits were terminated solely on the ground that he failed to satisfy the earnings prong. It would be reasonable to read the recurrent disability provision regarding worsening condition as being applicable only when the pertinent prior termination of benefits was based on a failure to satisfy the medical prong of disability. *Cf. Dandurand v. UNUM Life Ins. Co. of America*, 284 F.3d 331, 336-37 (1st Cir. 2002) (noting a distinction in applying a return to full-time work requirement under a UNUM policy's recurrent disability provisions when the prior termination of benefits was based on failing to meet the earnings prong, not on an improvement in the claimant's ability to work that enabled the claimant to return to work).[17]

---

[16]If it were to be found that plaintiff was entitled to disability benefits as of some time in October or November 1999, that is within the period for a recurrent disability, it would also have to be considered whether he was also entitled to benefits for December 1999. It is undisputed that plaintiff's earnings in December 1999 were a loss. Therefore, he undisputedly satisfied the 80% limitation for that month.

[17]Like the present case, *Dandurand* involved a UNUM disability policy. There is, however, no indication that the policy in *Dandurand* included a "worsening" provision.

During the administrative proceedings, defendant did not reach the issue of how the worsening prong of the recurrent disability definition should be construed when applied to a claimant who previously had his benefits terminated based on the earnings prong only. To the extent the worsening prong applies in such situations, defendant also did not reach the issue of whether plaintiff satisfied that prong. It did not consider whether plaintiff's condition improved during June and July 1999 when he earned substantial sums of money and then worsened again at some point between August 1 and November 30, 1999,[18] that is, before the six-month potential recurrent disability period expired. Defendant also never reached the issue of whether plaintiff satisfied the medical prong of disability during October, November, and December 1999. Defendant did not reach those issues because of its arbitrary and capricious application of six-month averaging that resulted in an incorrect determination that plaintiff did not satisfy the earnings requirement for October and November 1999. The record before this court is not conclusive as to whether plaintiff satisfied the medical prong of disability and/or the definition of recurrent disability. Therefore, the first determination of those issues will be left for defendant to decide. *See Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 477 (7th Cir. 1998); *Gallo v. Amoco Corp.*, 102 F.3d 918, 923 (7th Cir. 19; *Olson v. Troike,*

---

[18]There is nothing in the plain language of the definition of recurrent disability that requires that the worsening of one's condition exactly coincide with the date that the income requirement is again satisfied. Especially given the earnings prong that permits three-month averaging, it is doubtful that this requirement should be read as requiring such a match. In plaintiff's situation, for example, his actual income fell below the 80% mark in August and September, but the inclusion of prior months in the averaging prevented satisfaction of the earning prong. Also, because of delays in receiving payments or realizing income, earnings do not always coincide with dates actually worked. In any event, no conclusive determination is presently made as to what may be a reasonable construction of the worsening requirement. To the extent defendant subsequently construes the worsening requirement as being applicable to plaintiff's benefits for Fall 1999, it is also left to defendant to construe what is meant by worsening.

959 F. Supp. 847, 858 (N.D. Ill. 1997).

## D. Plaintiff's Third Claim of Disability

In denying plaintiff's third claim for benefits, defendant found that plaintiff did not satisfy the disability medical prong as of January 1, 2000. It must be considered whether that determination was arbitrary and capricious. In considering this issue, it should be kept in mind that the Policy provides that the claimant must submit a proof of claim and that the "proof of claim, provided at [claimant's] expense, must show: . . . the extent of [claimant's] disability, including restrictions and limitations preventing [claimant] from performing [claimant's] regular occupation." Thus, the Policy places the burden on the claimant to show disability. *Winters v. UNUM Life Ins. Co. of America*, No. 01 C 569, 2002 WL 31557505, at *2 (W.D. Wis. Feb. 21, 2002) ("*Winters I*").[19] Unlike some disability policies, *see, e.g., Sisto*, 2003 WL 22472022, at *4, the Policy contains no provision that expressly permits defendant to require that plaintiff be examined by a doctor of defendant's choosing. The proof of claim provision includes that plaintiff may "be required to give UNUM authorization to obtain additional medical information . . . as part of your proof of claim." That is not the same as requiring a claimant to be subjected to medical examinations. Thus, plaintiff's contention that defendant could have required him to be subjected to PET scans that may have provided objective medical evidence of the presence or absence of migraine headaches is not supported by the terms of the Policy. Instead, under the terms of the Policy, plaintiff had the burden of providing any objective medical evidence that was to be submitted as proof of disability and he had to bear the expense of any medical tests.[20] Where an ERISA disability plan places the

_____

[19]The *Winters* cases involve a UNUM disability policy with pertinent policy language that apparently is the same as that in the Policy presently before the court.

[20]Objective medical evidence submitted to prove the existence of a disability is distinct from the issue of which side would bear the burden of showing the 24-month limit on benefits applies because plaintiff's disability is based on self-reported symptoms. Since resolution of this case does not involve plaintiff possibly receiving more than 24 months of benefits, it is

28

burden of proving disability on the participant or beneficiary, it is not arbitrary and capricious conduct for the administrator to fail to act on its own to obtain medical evidence supporting that the participant or beneficiary is disabled. *Winters I*, 2002 WL 31557505, at *2. The Policy did not preclude defendant from requesting that plaintiff cooperate in submitting to particular tests or preclude it from requesting that plaintiff provide such test results at his own expense. The administrative history, however, shows that defendant was willing to reconsider its decisions in light of additional evidence and the procedures also permitted the submission of additional evidence on appeal. After the January 17, 2001, decision, if not earlier, plaintiff was aware that defendant had concerns about a lack of objective medical evidence. Thus, plaintiff was on notice and still could have conducted tests at his own expense.

There is no dispute that treating physician Robbins never conducted any medical tests that might have provided objective evidence supporting that plaintiff suffered from migraine headaches. Although defendant now contends that Dr. Robbins tends to puff his credentials, the administrative record contains a curriculum vitae establishing Dr. Robbins's specialty in headache treatment. Although Dr. Robbins was relying on plaintiff's subjective reports, he has treated plaintiff since August 1997 without finding any lack of credibility in plaintiff's report of symptoms. In his October 14, 1999, attending physician statement, Dr. Robbins states that plaintiff "is extremely legit, does not exaggerate symptoms at all, & is truly disabled." In a November 6, 2000, letter, Dr. Robbins made a similar assessment of plaintiff's credibility. Dr. Robbins's treatment notes support that plaintiff has suffered from severe headaches and migraine headaches and he has stated on a number of occasions that plaintiff is unable to concentrate or withstand the rigors necessary to be a floor trader. Over the course of Dr. Robbins's treatment, a number of medications have been prescribed. The medications had various effectiveness and some had side effects that left plaintiff unable to function. Generally,

---

unnecessary to reach the self-report issue and consider whether that is, as plaintiff contends, an exclusion for which defendant would bear the burden of proof.

plaintiff stayed on a particular medication for no more than a few months before trying to find a more effective medication.

Of course, defendant was not required to blindly accept plaintiff's subjective reports of his symptoms nor his treating physician's judgment as to the credibility of plaintiff's reports. However, in situations such as the present one where subjective reporting of symptoms is a principal element of diagnosis and treatment, defendant must have sufficient grounds for finding the claimant's subjective reports and the treating physician's evaluation non-credible, even when a deferential standard of review is being applied. *See Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 919 (7th Cir. 2003). There is evidence in the administrative record that it is possible to obtain objective medical evidence of migraine headaches, but that evidence is lacking in detail and does not establish whether those tests can also confirm the severity of symptoms. Also, plaintiff's headaches were not limited to migraine headaches and the evidence does not address whether non-migraine headaches can also be verified by objective medical tests. Moreover, defendant did not find that plaintiff did not have headaches, but found his reports as to the severity of his symptoms to be non-credible. *Compare id.* at 916. The Policy itself includes headaches as among the type of malady where symptoms generally are not verifiable by tests, procedures, or clinical examinations. On the administrative record that was before defendant and is now before this court, plaintiff's purported disability must be considered one in which the severity of symptoms is largely based on subjective reports. *Compare id.* at 916, 919.

There is no dispute that, taken at face value, plaintiff's subjective reports and Dr. Robbins's records support that plaintiff was disabled, that is, he could not perform the material and substantial duties of a floor trader. Therefore, the question is whether defendant's grounds for rejecting plaintiff's subjective reports and Dr. Robbins's conclusions were arbitrary and capricious. The grounds for rejecting this evidence was a lack of objective medical evidence; inconsistencies between assessed limitations and plaintiff's actual work activity; the surveillance

evidence; and that evidence covered time periods other than January 1, 2000.

The fact that no objective medical evidence has been submitted is not by itself a sufficient basis for rejecting a claim of disability based on a malady that the record indicates is generally indicated by subjective reports. *See Hawkins*, 326 F.3d at 919. The lack of objective medical evidence was a sound basis for inquiring further into the credibility of plaintiff's reports, but it was not a basis by itself for rejecting plaintiff's evidence. Additionally, the January 17, 2001, and June 8, 2001, decisions of defendant both refer to a failure to show a change or worsening of symptoms as of the claimed January 1, 2000, disability date. The Policy contains no requirement that a worsening of symptoms be shown as of the date of claimed disability. *Winters v. UNUM Life Ins. Co. of America*, 232 F. Supp. 2d. 918, 928 (W.D. Wisc. 2002) ("*Winters II*"). Moreover, logic does not require that proof of disability involve a worsening of the claimant's condition around the date that the claimant stops working. *Hawkins*, 326 F.3d at 918; *Perlman*, 195 F.3d at 983. If plaintiff was fully and satisfactorily performing as a floor trader up to December 31, 1999, then there might be sufficient reason to expect a change as of January 1, 2000. *See Perlman*, 195 F.3d at 982. But that is not the situation in this case. The record does not establish that plaintiff was working full-time without any limitations from August 1 through December 31, 1999. To the contrary, his income was down for those months[21] and he took a number of days off from trading. Plaintiff reported that he stopped working after August 1, 1999, and the record indicates that he worked sporadically through the remainder of the year.[22] Also, as previously discussed, it is an open

---

[21]Given the fluctuating income of a floor trader, a decrease in income could result from market conditions or losing trading decisions. Defendant, however, did not find that that was the cause of plaintiff's decrease in income after July 31, 1999.

[22]Neither side points to evidence in the record as to the actual days plaintiff worked. In the decisions on plaintiff's third claim for benefits, defendant indicates that it is an open question as to whether plaintiff worked enough hours to satisfy the active employment requirement for the period preceding January 1, 2000. The trading records appear to indicate that plaintiff was not trading on every possible work day. Also, defendant repeatedly

question for further administrative proceedings whether plaintiff was disabled in October, November, and December 1999. If those proceedings find that he was disabled through December 1999, certainly plaintiff does not have to show a change in his condition to show he was still disabled as of January 1, 2000. Plaintiff did not have to show a change in his condition as of January 1, 2000, in order to prove that he was disabled; he had to show that, as of January 1, 2000, he could no longer perform material and substantial duties of his occupation.

It must be considered whether evidence supports that plaintiff's work history or other activity was inconsistent with his reported symptoms and Dr. Robbins's assessment. In Dr. Robbins's November 6, 2000, letter, he stated that plaintiff "has not been able to stand and concentrate and think for more than a few minutes at a time." Such an extreme limitation is inconsistent with plaintiff's November 3, 2000, interview in which he stated that he works at the computer for one to two hours at a time, helps coach basketball and baseball, and goes on errands. Also, the surveillance of plaintiff approximately a month later showed that he was able to drive and perform errands that required more than a few minutes of thinking. Of course, the fact that plaintiff can, on at least some occasions, perform tasks for more than a few minutes does not show he is capable of consistently standing and making trades in a trading pit or that he is capable of full-time employment. *Cf. Hawkins*, 326 F.3d at 918 (fact that claimant can sit through a class and work on a computer for periods of time at home does not show that he can work a full-time position that requires almost constant use of a computer). It does show, however, that Dr. Robbins has, in this letter, overstated the effect of plaintiff's headaches and raises a question as to Dr. Robbins's credibility. The June 8, 2001, decision also points to Dr. Robbins's October 14, 1999, statement that, as of that date, plaintiff could not "concentrate to do any meaningful work." That statement is inconsistent with the fact that plaintiff was

---

contends that plaintiff has a history of choosing to work only when the soybean market in which he trades is busier. However, no such finding was made in the administrative decisions and defendant does not presently point to evidence supporting its contention as to plaintiff's prior work history.

doing some trading in October 1999 and the adjoining months.[23] In a May 11, 2000, statement, Dr. Robbins's stated that, as of that time, plaintiff "can't think or concentrate at all" and "can't work at all in that capacity." That is inconsistent with plaintiff's statement in his November 2000 interview that he did some trading during April, May, and June 2000. Defendant's consulting physician also opined that plaintiff's work and the surveillance were inconsistent with Dr. Robbins's opinions.

This evidence is a sufficient basis for raising questions about the credibility of Dr. Robbins's assessment of the effect of plaintiff's headaches on plaintiff's ability to work. It was not arbitrary and capricious for defendant to find that Dr. Robbins's assessments were not credible. The evidence that raises questions as to Dr. Robbins's credibility does not show that plaintiff was capable of performing full-time work as a trader; it only shows that plaintiff was not bedridden or otherwise incapable of functioning for more than a few minutes at a time. Defendant, though, does not have the burden of showing that plaintiff was able to work; plaintiff had the burden of showing that he was disabled.

The above-recited evidence does not go to the credibility of plaintiff himself. Plaintiff did not contend that, for the past few years, he has never been capable of concentrating for more than a few minutes at a time. Plaintiff does not dispute that there have been times when medications have controlled his headaches enough to permit some work. Focusing on January 1, 2000, the medical records show that plaintiff was using Zomig and Ultram from December 6, 1999, through April 28, 2000, but that the effectiveness of those medications had decreased

---

[23]The June 8, 2001, decision states that, at the time, plaintiff "continued to work in his regular occupation, and had substantial earnings." That is not quite accurate. Plaintiff had a loss in October 1999. He had earnings in September and November 1999, though substantially lower than his 1997 and 1998 average predisability earnings. As previously stated, the fact that plaintiff had earnings does not show the amount of hours he was actually working. However, Dr. Robbins's October 14, 1999, statement is inconsistent with plaintiff doing any trading whatsoever and clearly plaintiff was engaged in some amount of trading during that time period.

33

around February 16, 2000.[24] Between December 6, 1999, and February 16, 2000, Dr. Robbins's medical records do not record any reported problems. It was not arbitrary and capricious for defendant to find that plaintiff's medical records and subjective reports did not support that he was suffering from a disabling condition as of January 1, 2000.

This court must accord deference to defendant's determination that plaintiff was not disabled as of January 1, 2000. There is evidence in the record from which a reasonable finder of fact could reach such a conclusion. Therefore, it cannot be held that defendant was arbitrary and capricious when it denied plaintiff's third claim for benefits.

## IV. CONCLUSION

A judgment will be entered directing that defendant give further consideration to the question of whether plaintiff was entitled to disability benefits during October, November, and December 1999. In the further administrative proceedings, it must be taken as established that plaintiff satisfies the earnings prong for those months. It is left to defendant's discretion to determine the precise manner of proceedings. Within 40 days after the entry of judgment, defendant shall inform plaintiff in writing as to any further submissions that may be required from plaintiff. It is also left to the reasonably exercised discretion of defendant as to whether it will consider any submissions or new claims from plaintiff in which plaintiff may contend that he was disabled at some point in 2000 other than January 1, 2000, including dates that would constitute a recurrent disability if plaintiff is found to have been disabled during all of some of October, November, and December 1999. Should plaintiff seek to submit further proof that he was disabled as of January 1, 2000, it is also left to defendant's reasonably exercised

---

[24]Plaintiff presently points to entries in the Physicians Desk Reference that commonly reported side effects from Ultram include somnolence, dizziness, and nausea and that reported side effects of Zomig include nausea, dizziness, drowsiness, malaise, and fatigue. Plaintiff, however, does not point to evidence in the administrative record that he actually suffered such side effects at any point or particularly near January 1, 2000. Also, the consulting physicians who examined the medical records did not opine that plaintiff was likely suffering limitations from being on these medications.

discretion as to whether it will reconsider that issue.

Since defendant is being ordered to further consider whether plaintiff was disabled during a three-month time period and plaintiff has previously received approximately three and one-half months of benefits, the question of whether plaintiff would be limited to 24 months of benefits under the self-reported symptoms provision of the Policy is not an existing controversy. Moreover, defendant has not yet had reason to address that issue regarding plaintiff's claim. If, at some point, plaintiff successfully shows he is potentially entitled to benefits for more than 24 months, defendant should have the first opportunity to consider the application to plaintiff's claim of possibly ambiguous language contained in the self-reported symptoms provision. No opinion is expressed regarding the application of the self-reported symptoms provision to potential claims of plaintiff.

Because plaintiff's claims fall under ERISA, plaintiff's Count II claim pursuant to 215 ILCS 5/155 is preempted. *Dwyer*, 2003 WL 22844234, at *5; *Ruttenberg I*, 2003 WL 21003719, at *5-6.

IT IS THEREFORE ORDERED that defendant's motion to strike [36-1], defendant's motion for summary judgment [25-1], and plaintiff's motion for summary judgment [27-1] are granted in part and denied in part. The Clerk of the Court is directed to enter judgment in favor of plaintiff and against defendant directing that defendant give further consideration to plaintiff's claim that he was entitled to disability benefits in October, November, and December 1999. Within 40 days after the entry of judgment, defendant shall inform plaintiff in writing regarding any further submissions that will be required from plaintiff.

ENTER:

JOAN B. GOTTSCHALL
United States District Judge

DATED: March 24, 2004